**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF GEORGIA**

-------------------------------------------------------------X

| | |
|---|---|
| **REPRESENTATIVE EARL D. EHRHART** : | |
| **and VIRGINIA EHRHART,** : | **Civ. No.** |
| : | |
| **Plaintiffs,** : | |
| : | |
| **-against-** : | |
| : | |
| **THE UNITED STATES DEPARTMENT** : | **JURY TRIAL** |
| **OF EDUCATION, THE UNITED STATES** : | **DEMANDED** |
| **DEPARTMENT OF EDUCATION'S** : | |
| **OFFICE FOR CIVIL RIGHTS, JOHN B.** : | |
| **KING, JR., individually and as agent for the** : | |
| **DEPARTMENT OF EDUCATION,** : | |
| **CATHERINE LHAMON, individually and as** : | |
| **agent for the UNITED STATES** : | |
| **DEPARTMENT OF EDUCATION'S OFFICE** : | |
| **FOR CIVIL RIGHTS, and the UNITED** : | |
| **STATES OF AMERICA,** : | |
| : | |
| **Defendants.** : | |

-------------------------------------------------------------X

<u>**COMPLAINT**</u>

Plaintiff Representative Earl D. Ehrhart ("Representative Ehrhart") and

Plaintiff Virginia Ehrhart ("Mrs. Ehrhart")(collectively, the "Plaintiffs") by their

attorneys Nesenoff & Miltenberg, LLP, together with Krevolin & Horst, LLC, as

and for their Complaint against the United States Department of Education, the

United States Department of Education's Office for Civil Rights, John B. King, Jr.,

individually and as agent for the United States Department of Education, Catherine Lhamon, individually and as agent for the United States Department of Education's Office for Civil Rights, and the United States of America, respectfully allege as follows:

## THE NATURE OF THIS ACTION

1.      This case arises out of the actions taken and procedures employed by Defendants the United States Department of Education, the United States Department of Education's Office for Civil Rights, John B. King, Jr., Catherine Lhamon, and the United States of America (collectively, the "Defendants") concerning the improper implementation and enforcement of the United States Department of Education Office for Civil Rights' 2011 Dear Colleague Letter (hereinafter the "Dear Colleague Letter" or the "Letter") in violation of the Administrative Procedure Act, 5 U.S.C. § 553 (the "APA").

2.      While Defendants designate the Dear Colleague Letter as a "guidance" document that merely interprets the requirements of Title IX of the Education Amendments of 1972, in actuality, the Dear Colleague Letter advances new substantive rules and creates binding obligations on the affected parties under

threat of severe penalties, including investigation and rescission of federal funding for non-compliant educational institutions.

3.      Upon information and belief, the federal government allocated approximately $154 billion to education in fiscal year 2015, making up approximately 4.2% of the entire federal budget.

4.      Since its enactment in 2011, the Dear Colleague Letter has produced sweeping changes to the regulatory landscape and ensuing conduct by every educational institution receiving federal funding across the country.

5.      The Dear Colleague Letter has aggressively dictated how colleges and universities handle sexual assault and sexual harassment on campus, by laying out specific requirements that schools must adopt and utilize, causing schools to brand more students "rapists" based on the excessively low "preponderance of the evidence" standard (equating to a mere 50.01% probability that the alleged misconduct occurred) as opposed to the "clear and convincing evidence" standard traditionally used in college disciplinary hearings, allowing accusers to appeal not-guilty findings by disciplinary panels, and preventing accused students from challenging their accusers, even in cases in which the only witness is the complainant, out of concern that cross-examination "may be traumatic or

intimidating" to the "victim," all of which violate an accused student's fundamental rights to due process.

6.      The Defendants exceeded their authority and violated § 553 of the Administrative Procedure Act when they circumvented the requisite notice and comment rulemaking while nonetheless enforcing the Dear Colleague Letter as binding law.

7.      The Defendants' failure to abide by the proper rulemaking procedures has resulted in ongoing unlawful and *ultra vires* practices and policies which render the Dear Colleague Letter, and all disciplinary decisions arising therefrom, unconstitutional, arbitrary and void.

8.      While Plaintiffs unequivocally agree that all students should be able to enjoy a safe educational environment, regardless of sex, and that sexual harassment, discrimination and violence cannot be tolerated, Defendants must abide by the proper statutory protocol to promote these objectives.

9.       The United States Department of Education, by issuing the Dear Colleague Letter without following the Administrative Procedure Act's rulemaking requirements has imposed on the State of Georgia's colleges and universities, an unworkable regulatory framework that has resulted in the imposition of unnecessary costs and expenses that flow directly to both Federal and Georgia

Taxpayers, including Plaintiffs, under the threat of Federal funding being revoked for the schools' failure to comply.

10.     Accordingly, Plaintiffs, as both Federal and Georgia taxpayers, and the parents of a son currently enrolled as a student at the Georgia Institute of Technology (hereinafter "Georgia Tech"), have suffered an injury in fact as a result of Defendants' actions and have a personal stake in the outcome of this matter, as they continue to suffer economic damages.

## THE PARTIES

11.     Plaintiff Representative Ehrhart is a natural person, a citizen of the United States, and a resident of the State of Georgia. During the events described herein, Plaintiff Representative Ehrhart was a resident of Powder Springs, Georgia and both a United States and Georgia taxpayer. In addition, Plaintiff is the duly elected representative to the Georgia House of Representatives from District 36 of the State of Georgia. District 36 includes portions of Northwest Cobb County. Representative Ehrhart is a member of the Georgia House of Representative's Appropriations Committee and currently serves as the Chairman of the Appropriation's Higher Education subcommittee. The Higher Education subcommittee is responsible for, among other things, legislation influencing the University System of Georgia, as well as issues relating to universities, colleges,

post-secondary education, and student financial aid within the State. In addition, Representative Ehrhart has a stepson through his marriage to Plaintiff Virginia Ehrhart who is currently enrolled at Georgia Tech.

12.     Plaintiff Virginia Ehrhart is a natural person, a citizen of the United States, a resident of the State of Georgia, and the wife of Representative Ehrhart. During all relevant times herein, Plaintiff Mrs. Ehrhart was a resident of Powder Springs, Georgia and a United States and Georgia taxpayer.  In addition, Mrs. Ehrhart is the mother of a student currently enrolled at Georgia Tech.  As parents, Representative Ehrhart and Mrs. Ehrhart have heard countless stories of young men being accused, investigated, and subsequently expelled from Georgia colleges and universities without being provided appropriate due process protections. Plaintiffs are intimately aware of the problems created by the Dear Colleague Letter based on Representative Ehrhart's work as the Chairman of the Appropriation's Higher Education subcommittee. Plaintiffs are concerned that in the current regulatory climate Mrs. Ehrhart's son could, like any other male college student, be wrongly accused and found responsible under the directives imposed by the Dear Colleague Letter. Accordingly, Plaintiffs are justifiably concerned that the money they have saved for college tuition and expenses could be lost and their son's reputation and career prospects irreparably damaged.

13.     Defendant United States Department of Education ("Defendant DOE") is a federal executive department established in the Executive Branch of the United States Government charged with *inter alia*, enforcing educational laws regarding civil rights including, but not limited to, Title IX of the Education Amendments Act of 1972, whose headquarters are located in Washington, D.C. The DOE is an agency within the meaning of 5 U.S.C. § 701(b)(1).

14.     Defendant United States Department of Education's Office for Civil Rights ("Defendant OCR") is an agency within the Defendant DOE that is charged with ensuring compliance by recipients of federal education funding with, *inter alia*, Title IX of the Education Amendments Act of 1972. Defendant OCR is headquartered in Washington, D.C. Defendant OCR is an agency within the meaning of 5 U.S.C. § 701(b)(1).

15.     Defendant John B. King, Jr. ("Defendant King") is the Secretary of Education of the Defendant DOE charged with overseeing and managing Defendant DOE and has direct authority over education policy promulgated by Defendant DOE. Defendant King, in his official capacity, is the officer personally responsible for compliance with any court decree to the extent such decree relates to or impacts Defendant DOE.

16.     Defendant Catherine Lhamon ("Defendant Lhamon") is the Assistant Secretary for Defendant OCR and primary advisor to Defendant King, with authority over education policy promulgated by Defendant DOE. Defendant Lhamon is in charge of maintaining and operating Defendant OCR and therefore has direct authority to ensure educational institutions are in compliance with federal civil rights law including, but not limited to, Title IX of the Education Amendments Act of 1972. Defendant Lhamon, in her Official Capacity as the Assistant Secretary for Defendant OCR, is the officer personally responsible for compliance with any court decree to the extent such decree relates to or impacts the Defendant OCR.

17.     Defendant U.S. is the United States of America ("Defendant U.S.").

18.     Plaintiffs and Defendants are sometimes hereinafter collectively referred to as the "Parties."

## JURISDICTION AND VENUE

19.     This Court has federal question jurisdiction pursuant to 28 U.S.C. § 1331 because: (1) the federal law claims arise under the constitution and statutes of the United States; and (2) 28 U.S.C. § 1331 confers original jurisdiction on federal courts to review agency action.

20.     Defendant DOE is an agency within the meaning of 5 U.S.C. § 701(b)(1). This Court has personal jurisdiction over Defendant DOE on the grounds that it has engaged in continuous and systematic business activities within the State of Georgia sufficient to satisfy the "minimum contacts" requirement in this Court, specifically with respect to its implementation and enforcement of the 2011 Dear Colleague Letter and mandated compliance by colleges and universities located within the State of Georgia, under threats of investigation and rescission of federal funds.

21.     Defendant OCR is an agency within the meaning of 5 U.S.C. § 701(b)(1). This Court has personal jurisdiction over Defendant OCR on the grounds that it has engaged in continuous and systematic business activities within the State of Georgia sufficient to satisfy the "minimum contacts" requirement in this Court, specifically with respect to its implementation and enforcement of the 2011 Dear Colleague Letter and mandated compliance by colleges and universities located within the State of Georgia, under threats of investigation and rescission of federal funds.

22.     This Court has personal jurisdiction over Defendant King on the grounds that he was acting as an agent of the United States Department of Education at all relevant times herein.

23.     This Court has personal jurisdiction over Defendant Lhamon on the grounds that she was acting as an agent of the United States Department of Education's Office for Civil Rights at all relevant times herein.

24.     5 U.S.C. § 702 provides in relevant part: "A person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof … [p]rovided that any mandatory or injunctive decree shall specify the Federal officer or officers (by name and title), and their successors in office, personally responsible for compliance."

25.     5 U.S.C. § 702 further provides, in relevant part: "The United States may be named as a defendant in any such action, and a judgment or decree may be entered against the United States."

26.     Accordingly, this court has jurisdiction over all Defendants pursuant to 5 U.S.C. §§ 702-03.

27.     Venue for this action is proper in this court pursuant to 5 U.S.C. § 703.

28.     Further, venue for this action properly lies in this district pursuant to 28 U.S.C. § 1391(e)(1) because a substantial part of the events or omissions giving rise to the claim occurred in this district and Plaintiffs reside in this judicial district.

## FACTUAL ALLEGATIONS COMMON TO ALL CLAIMS

### I.      Title IX of the Education Amendments of 1972

29.      On June 23, 1972, President Richard M. Nixon signed Title IX of the Education Amendments of 1972, 20 U.S.C.A. § 1681, et seq., into law. A comprehensive federal law that prohibits discrimination on the basis of sex in any federally funded education program or activity, the principal objective of Title IX is to avoid the use of federal money to support sex discrimination in education programs and to provide individual citizens effective protection against those practices.[1]

30.      The statute provides, in relevant part, that:  "No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance."

31.      Title IX applies, with a few specific exceptions, to all aspects of federally funded education programs or activities, including educational institutions such as colleges, universities, and elementary and secondary schools, as well as any education or training program operated by a recipient of federal financial assistance.

---

[1] https://www.justice.gov/crt/overview-title-ix-education-amendments-1972-20-usc-1681-et-seq.

32.     The Revised Sexual Harassment Guidance dated January 19, 2001 (the "2001 Guidance") issued by Defendant OCR required schools to "adopt and publish a policy against sex discrimination and grievance procedures providing for *prompt and equitable resolution* of complaints of discrimination on the basis of sex." (*emphasis added*).[2]

33.     The 2001 Guidance further instructed that the procedures adopted by a school covered by Title IX must not only "ensure the Title IX rights of the complainant," but must also *"[accord] due process to both parties involved..."*[3]

34.     To ensure the requisite level of due process, the 2001 Guidance identified the minimum level of procedures that must be in place, including:

- "Notice . . . of the procedure, including where complaints may be filed";

- "Application of the procedure to complaints alleging [sexual] harassment...";

- "Adequate, reliable, and impartial investigation of complaints, including the opportunity to present witnesses and other evidence";

---

[2] *See generally* U.S. Dep't of Education, Office for Civil Rights, *Revised Sexual Harassment Guidance: Harassment of Students by School Employees, Other Students, or Third Parties -- Title IX* (2001) at 19-20, 21.

[3] *Id.* at 22 (emphasis added).

- "Designated and reasonably prompt timeframes for the major stages of the complaint process"; and

- "Notice to the parties of the outcome of the complaint......"[4]

35.     Further, the 2001 Guidance instructed that a school has an obligation under Title IX to make sure that all employees involved in the conduct of the procedures have "adequate training as to what conduct constitutes sexual harassment, which includes "alleged sexual assaults." [5]

36.     Significantly, nowhere in the 2001 Guidance was the "preponderance of the evidence" standard mentioned.

37.     Rather, in its Revised Sexual Harassment Guidance of 2001, Defendant OCR provided colleges and universities with wide latitude in adopting policies and procedures that best fit the particular institution, noting: "[p]rocedures adopted by schools will vary considerable in detail, specificity, and components, reflecting differences in audiences, school sizes and administrative structures, State or local legal requirements, and past experience." [6]

---

[4] *Id.* at 20.

[5] *Id.* at 21.

[6] *Id.* at 20.

38.     As such, the subsequent enactment of uniform procedures and standards of review as promulgated by the 2011 Dear Colleague Letter unambiguously created a new set of binding rules and imposed new obligations on the affected parties.

## II.     The 2011 Dear Colleague Letter

39.     The 2011 Dear Colleague Letter was formally announced by Vice President Joe Biden and former U.S. Secretary of Education Arne Duncan at the University of New Hampshire on April 4, 2011.

40.     According to Defendant Lhamon, the Dear Colleague Letter was designed to "help schools better understand their obligations under Title IX to prevent and respond to sexual violence."

41.     However, the 2011 Dear Colleague Letter was not, in practice or effect, a genuine guidance document, as it instructed educational institutions receiving federal funds to adopt specific procedures in the handling of sexual misconduct cases, and coerced the schools' compliance by threatening to rescind potentially billions of dollars in federal funding.

42.     Since its enactment, the 2011 Dear Colleague Letter has aggressively dictated how colleges handle sexual assault and sexual harassment on campus, by laying out specific requirements that schools must adopt and utilize,

which essentially equate the filing of a complaint to guilt, and promulgating an overly broad definition of sexual harassment.

43.     Specifically, the requirements outlined in the Dear Colleague Letter have pressured schools to crack down on sexual misconduct investigations, causing schools to brand more students "rapists" based on the excessively low "preponderance of the evidence" burden of proof (equating to a mere 50.01% probability that the alleged misconduct occurred) as opposed to the "clear and convincing evidence" standard traditionally used in college disciplinary hearings, allowing accusers to appeal not-guilty findings by disciplinary panels, and preventing accused students from challenging their accusers, even in cases in which the only witness is the complainant, out of concern that cross-examination "may be traumatic or intimidating" to the "victim."

44.     The Dear Colleague Letter's elimination of the accused's right to cross-examination is of particular concern. It is well established that cross-examination is a fundamental procedural protection and "beyond any doubt the greatest legal engine ever invented for the discovery of truth."[7] Especially in cases

---

[7] *See California v. Green,* 399 U.S. 149, 158, 90 S.Ct. 1930, 1935, 26 L.Ed.2d 489 (1970), quoting 5 J. Wigmore, Evidence § 1367, p. 29 (3d ed. 1940); *Kentucky v. Stincer*, 482 U.S. 730, 736, 107 S. Ct. 2658, 2662, 96 L. Ed. 2d 631 (1987).

where a determination of responsibility hinges on the credibility of the parties and witnesses, the right to cross-examine one's accuser is essential to ensure due process.

45.     Based on the foregoing, the Defendants, in enforcing the Dear Colleague Letter without following the notice and comment rulemaking requirements of the Administrative Procedure Act, have imposed on colleges and universities, including Georgia Tech, an unworkable regulatory framework that has resulted in severe, unwarranted and permanent damages to male students accused of sexual misconduct, under the threat of severe penalties including rescission of federal funds.

46.     Through their enforcement of the Dear Colleague Letter, the Defendants have forced schools to set up a quasi-legal system to investigate and adjudicate allegations of sexual misconduct; yet, the policies adopted often violate many civil liberties and fail to afford the accused student with the due process protections associated with a criminal trial.

47.     The foregoing has caused the Dear Colleague Letter to become a highly divisive document, criticized by law professors, lawyers, educators, journalists, civil liberties groups and members of Congress.

### III.   Judicial Review of Agency Action

### A. Statutory Authorization

48.   Sections 702 to 704 of the APA provide a general cause of action for parties adversely affected or aggrieved by agency action for which there is no other adequate remedy in court.

49.   Due to the lack of any specific statute authorizing judicial review of actions by the Department of Education, Sections 702-704 of the APA afford Plaintiffs a general cause of action to challenge Defendant DOE's implementation and enforcement of the 2011 Dear Colleague Letter on the grounds that it failed to comply with the APA's notice and comment rulemaking requirements.

50.   The APA provides that judicial review of agency action may be invoked by a person who has been "adversely affected or aggrieved" by any final agency action "within the meaning" of the statute at issue. 5 U.S.C. § 702.

51.   Plaintiffs have suffered an injury in fact as a result of Defendants' actions; the enforcement of the Dear Colleague Letter has resulted in the imposition of unnecessary costs and expenses that flow directly to both Federal and Georgia Taxpayers, including Plaintiffs, under the threat of Federal funding being revoked for the schools' failure to comply.

52.     Plaintiffs' damages stem from a final agency action for which there is no other adequate alternative remedy in court to challenge the actions of Defendants.

53.     Defendants' enactment of the Dear Colleague Letter, without submission to proper notice and comment rulemaking as required by the APA was an improper exercise of congressional power or appropriation under the taxing and spending clause of Art. I, § 8, of the Constitution.

54.     Title IX does not specifically provide for federal court review of a taxpayer's challenge to the implementation and enforcement of a purported "guidance" document.

55.     As such, Plaintiffs have standing to challenge the validity of the 2011 Dear Colleague Letter.

## B. Sovereign Immunity Waived

56.     When challenging the action of a federal agency, the APA provides a broad waiver of sovereign immunity: "A person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof. An action in a court of the United States seeking relief other than money damages and stating a claim that an agency or an officer or employee thereof acted or failed to act in an

official capacity or under color of legal authority shall not be dismissed nor relief therein be denied on the ground that it is against the United States or that the United States is an indispensable party." *See* 5 U.S.C. § 702.

57.     As such, sovereign immunity is waived where, as here, Plaintiffs as aggrieved parties seeks prospective equitable relief and the agency conduct being challenged is considered a final action by Defendant DOE, made subject to judicial review by statute.

58.     Thus, Defendant U.S. has waived its sovereign immunity for actions against the United States, its instrumentalities, and officers for non-monetary injunctive and equitable relief and for the entry of judgments and decrees against the United States in such actions.

## C. Finality of Administrative Action

59.     An agency decision may be final even though the agency labels it as informal "guidance" or non-binding interpretations, when the agency treats the action as binding for all practical purposes.

60.     Defendant DOE's Dear Colleague Letter of 2011 is a final agency action in that it is the consummation of the agency's decision-making and has been carried out as binding law since its adoption in 2011.

61.     Defendant DOE's Dear Colleague Letter is a final agency action in that it determines rights and obligations of every educational institution that receives federal funding and creates directs legal consequences for those that fail to comply with its directives.

62.     Upon information and belief, in February 2015, the Obama administration proposed a federal budget to Congress that would increase funding to the Department of Education's Office for Civil Rights by approximately 29%, to $130 million. The requested budget increase purportedly aimed to address the backlog in completing Title IX investigations by earmarking the additional funds for more personnel at the agency's regional offices, in effect rewarding the Defendants' overreaching on college campuses.

63.     Ultimately, a congressional spending agreement approved an increase in Defendant OCR's budget by about 7%, from $100 million in 2015 to $107 million in 2016.

64.     Prior to Defendant DOE's issuance of the Dear Colleague Letter, the University of Georgia System handled sexual harassment and sexual assault claims through the student disciplinary process.

65.     In light of the Dear Colleague Letter, each of the twenty-nine schools in the University System of Georgia were forced to create a Title IX

enforcement office and designate and hire personnel to ensure compliance with the Letter's requirements to avoid the risk that the University System's funding could be revoked. The University System of Georgia has spent millions of dollars on this endeavor since the issuance of the Dear Colleague Letter in an effort to avoid the loss of Federal funds. The loss of Federal funds would require Georgia taxpayers to fund the resulting budget gap, but would inevitably necessitate cutting back programs at the schools.

66.     According to an article published in the *Washington Examiner* on April 19, 2016 entitled "Colleges Are Spending Millions Defending Themselves From Accused Student Lawsuits," so far in 2016, eight different judges have ruled favorably for students accused of campus sexual assault who are suing their universities for gender discrimination and a lack of due process.[8]

67.     That same article reported that lawsuits from students involved in sexual assault accusations "can run into the high six or even seven figures, not counting a settlement or verdict."   *Id*.   The *New York Times* reported similar

---

[8] http://www.washingtonexaminer.com/colleges-are-spending-millions-defending-themselves-from-accused-student-lawsuits/article/2588959#.VxeQyE_abBY.twitter.

findings in a March 29, 2016 article entitled "Colleges Spending Millions to Deal with Sexual Misconduct Complaints."[9]

68.     The costs associated with complying with the Dear Colleague Letter are not limited to defending and settling lawsuits. To obey the mandates of the Dear Colleague Letter, schools throughout Georgia, and across the United States, have had to reinforce their Title IX offices to deal with accusations and ensure the resulting investigations comply with the Dear Colleague Letter. Colleges have spent millions to hire lawyers, investigators, case workers, survivor advocates, peer counselors, workshop leaders and other officials to deal with increasing numbers of these complaints.

69.     The *Washington Examiner* article reported that Harvard University, for example, employs 50 full-time and part-time Title IX coordinators across its 13 schools. Yale employs nearly 30 faculty and staff members to handle Title IX issues, and pays 48 students to listen to their peers and report on what they deem distress. Columbia University employs 11 educators and 7 case workers to handle Title IX complaints.

70.     According to the *Washington Examiner*, the salaries of each of these staff members range between $50,000 and $150,000 a year. It is estimated that a

---

[9] http://www.nytimes.com/2016/03/30/us/colleges-beef-up-bureaucracies-to-deal-with-sexual-misconduct.html?_r=0.

small school can easily spend $25,000 or more a year on Title IX compliance and larger schools, more than $500,000 a year in what is essentially an attempt to micromanage student sex lives.

71.    Upon information and belief, the salaries paid to Title IX compliance staff members are similar across the country. Harvard, Yale, and Columbia had endowments of more than $36 billion, $23 billion, and $9 billion respectively according to figures published by *U.S. News & World Report* in October 2015.[10]

72.    In contrast, the two wealthiest schools in the University System, Georgia Tech and the University of Georgia, have endowments that are a shadow of their Ivy League peers. In the fall of 2014, Georgia Tech reported that its endowment was approximately $1.89 billion in the fall of 2014[11] and the University of Georgia reported that its endowment was slightly more than $1 billion during Fiscal Year 2015.[12]

73.    Georgia Tech's overall enrollment consists of more than 25,000 undergraduate and graduate students, while the University of Georgia has an

---

[10] http://www.usnews.com/education/best-colleges/the-short-list-college/articles/2015/10/06/10-universities-with-the-largest-endowments.

[11] https://en.wikipedia.org/wiki/Georgia_Institute_of_Technology.

[12] https://en.wikipedia.org/wiki/University_of_Georgia.

undergraduate and graduate population of more than 35,000 students.  In contrast, Harvard enrolls more than 21,000 students; Yale enrolls approximately 12,312 students; and Columbia just under 28,000 students.

74.     Upon information and belief, the student populations between these schools are relatively similar and the Title IX related demands are comparable. Given the disparities in the endowments among the various schools, Georgia taxpayers are forced to make up the inevitable budget shortfalls.

75.     Based on hearings conducted by Representative Ehrhart and his colleagues in the Georgia House of Representatives in January 2016, Plaintiffs are deeply concerned that regardless of the amount of money invested in attempting to comply with the Dear Colleague Letter, the States' colleges and universities are not properly equipped to handle the types of investigations that they are required to perform.  Such claims are better left for the criminal justice system.

76.     Moreover, Plaintiffs believe that the requirements of the Dear Colleague Letter, however well intentioned, cannot be effectively implemented simply by making additional financial investments in personnel and resources. Instead, the Dear Colleague Letter forces colleges and universities to attempt to essentially micromanage the sex lives of students.

77.     Upon information and belief, since 2011, Defendant DOE has commenced more than 240 investigations against colleges and universities to determine whether their sexual misconduct policies and procedures are in compliance with the mandates of the Dear Colleague Letter.

78.     Upon information and belief, Defendant DOE has threatened to rescind federal funding from those schools that do not enter into a "voluntary" agreement concerning revisions that will be made to ensure their policies comply with the Dear Colleague Letter.

79.     Indeed, Defendant Lhamon testified at the Senate Hearing on "Sexual Assault on Campus: Working to Ensure Student Safety" on June 26, 2014 (the "Senate Hearing") that "some schools are still failing their students by responding inadequately to sexual assaults on campus. For those schools, my office and this Administration have made it clear that the time for delay is over."

80.     As such, Defendant DOE has imposed explicit obligations on educational institutions receiving federal funding, under the threat of potentially severe financial consequences.

81.     Notwithstanding Defendant DOE's repeated characterization of the Dear Colleague Letter as an "informal" guidance document, Defendant DOE has

undoubtedly treated the Dear Colleague Letter as binding on regulated parties for all practical purposes.

82.     Defendant Lhamon testified at the Senate Hearing that "we do" expect institutions to comply with Title IX guidance documents.

83.     Defendant Lhamon additionally testified: "The 2011 DCL affirms that the Title IX requirements for sexual harassment and OCR's 2001 guidance on sexual harassment also apply to sexual violence and lays out *the specific Title IX requirements* applicable to sexual violence" (emphasis added), rather than simply recommendations or suggestions.

84.     Speaking at a conference on campus sexual assault held at Dartmouth College in July 2014, Defendant Lhamon also stated that despite the fact it had never been done before, she was prepared to cut off federal funding to schools that violate Title IX. She went on to describe that enforcement mechanism as part of a set of "very, very effective tools;" Lhamon said, "If a school refuses to comply with Title IX in any respect, I will enforce."

85.     Further negating the Defendants' assertion that the Dear Colleague Letter is interpretative, OCR made clear in 2014 that it saw the Letter as binding, when it threatened Tufts University with full defunding when it balked at agreeing

to a finding that its current policies violated Title IX as newly construed by Defendant OCR.

86.     In reference to the power of threatening rescission of federal funds, Defendant Lhamon stated in June 2014 that her office's conflict with Tufts University was "the best example of how well that tool is working for us."

87.     There is no doubt that the Dear Colleague Letter has also resulted in significant action and legal consequences; Defendant Lhamon recognized that: "Our release of the 2011 DCL is widely credited with having sparked significant changes at colleges and universities as they worked to meet Title IX's requirements consistent with the 2011 DCL."

88.     At the Senate Hearing of June 26, 2014, Senator Lamar Alexander expressed concern that by calling the Dear Colleague Letter's dictates "guidance," Defendant OCR was essentially trying to create new law without adhering to the procedures normally required for new federal regulations under the Administrative Procedure Act, particularly providing the public with notice of the proposed regulations and allowing an opportunity for public comment. Senator Alexander recognized the enormous effect such "guidance" has had on educational institutions and students nationwide, stating: "What [the OCR is] doing is writing out detailed guidance for 22 million students on 7200 campuses…" without

identifying the underlying regulatory or statutory authority that allows such agency action.

89.     While Defendant Lhamon contended that this OCR "guidance" document did not create new regulations, but simply explained what the law is, Defendants overlook the fact that the Dear Colleague Letter, both explicitly and through direct and implicit threats—created new standards and requirements for colleges and universities in dealing with sexual assault.

### D. Agency Action Ripe for Judicial Review

90.     The Dear Colleague Letter is ripe for judicial review as it has influenced, and continues to affect, the conduct of regulated parties since 2011.

91.     Should this Court fail to consider the validity of the 2011 Dear Colleague Letter, Plaintiffs will continue to suffer undue hardship, along with other similarly situated aggrieved taxpayers and students, across the country.

92.     Accordingly, Plaintiffs, as both Federal and Georgia taxpayers, have suffered an injury in fact as a result of Defendants' actions and have a personal stake in the outcome of this matter, as they continue to suffer economic damages.

93.     Moreover, given the current regulatory climate, Plaintiffs are justifiably concerned that their son, a student enrolled at Georgia Tech could, like any other male college student, be wrongly accused and found responsible for

sexual misconduct under the directives imposed by the Dear Colleague Letter.  As parents, the money they had saved for college tuition and expenses could be lost and their son's reputation and career prospects irreparably damaged.

94.     Plaintiffs' damages stem from a final agency action for which there is no other adequate alternative remedy in court: Title IX does not specifically provide for federal court review of a taxpayer's challenge to the implementation and enforcement as binding of a purported "guidance" document.

95.     As such, Plaintiffs have standing, as both Federal and Georgia taxpayers, to challenge the validity of the 2011 Dear Colleague Letter.

## IV.     Administrative Procedure Act § 553 Notice and Comment Rulemaking

96.     The APA governs the process by which federal agencies, including the United States Department of Education's Office for Civil Rights, promulgate rules.

97.     The APA defines a "rule" in relevant part as follows: "the whole or a part of an agency statement of general or particular applicability and future effect designed to implement, interpret, or prescribe law or policy..." 5 U.S.C. § 551(4).

98.     To ensure uniform standards in the conduct of formal rulemaking and adjudication and ensure federal agencies' accountability to the public, the APA

imposes the checks and balances system known as notice and comment rulemaking.

99.     Among the purposes of the APA's notice and comment requirements are "(1) to ensure that agency regulations are tested via exposure to diverse public comment, (2) to ensure fairness to affected parties, and (3) to give affected parties an opportunity to develop evidence in the record to support their objections to the rule and thereby enhance the quality of judicial review."[13]

100.    Under 5 U.S.C. § 553(b)-(c), agency action that promulgates a "substantive" or "legislative" rule requires notice-and-comment rulemaking, which requires publication in the *Federal Register* and the agency's responding to comments as part of its final rule. Agency action that purports to make such amendments without complying with the relevant procedural requirements are of no force or effect and are void *ab initio*.

101.    However, the APA exempts from these procedural requirements: (1) interpretative rules; (2) general statements of policy; and (3) rules of agency organization, procedure, or practice.

---

[13] *See United States v. Reynolds*, 710 F.3d 498, 517 (3d Cir. 2013).

102.     Thus, distinguishing between a substantive rule, which requires notice and comment, and an interpretative rule, which does not, is critical. In determining whether the rule at issue is substantive or interpretative, the Supreme Court has focused on the impact of the potential rule on individual rights and obligations.

103.     "An 'interpretative rule' describes the agency's view of the meaning of an existing statute or regulation." *Batterton v. Marshall,* 648 F.2d 694, 702 n. 34 (D.C.Cir.1980). The court's inquiry in distinguishing legislative rules from interpretative rules "is whether the new rule effects a substantive regulatory change to the statutory or regulatory regime." *Elec. Privacy Info. Ctr. v. U.S. Dep't of Homeland Sec. (EPIC),* 653 F.3d 1, 6–7 (D.C.Cir.2011). Interpretative rules are those that clarify or explain existing law or regulations. They do not alter the rights or obligations of those affected.

104.     A legislative or substantive rule, on the other hand, "is one that does more than simply clarify or explain a regulatory term, or confirm a regulatory requirement, or maintain a consistent agency policy." *Nat'l Family Planning & Reprod. Health Ass'n, Inc.,* 979 F.2d at 237. A rule is legislative if it supplements a statute, adopts a new position inconsistent with existing regulations, or otherwise effects a substantive change in existing law or policy. Furthermore, a rule is

considered substantive if it has a present and binding consequence on the affected parties. Often, a legislative rule will include imperative language, such as "must" or "will."

## V.    The 2011 Dear Colleague Letter Violated APA § 553

105.    While the Defendants designate the Dear Colleague Letter as a "guidance" document that merely interprets the requirements of Title IX of the Education Amendments of 1972, in actuality, the Dear Colleague Letter advances new substantive rules and binding obligations on the affected parties, under threat of severe penalties.

106.    There is no doubt that since its implementation in 2011, the Dear Colleague Letter has resulted in sweeping changes to the regulatory landscape and resultant conduct by every educational institution receiving federal funding.

107.    Defendants have imposed significant pressure on colleges and universities across the country to comply with the mandates of the Dear Colleague Letter, by threatening to conduct investigations into their handling of Title IX complaints, and rescind billions of dollars in federal funding, a powerful weapon that could result in the effective demise of numerous institutions. This intimidation tactic has coerced schools to revise their policies and procedures in an attempt to comply with the Dear Colleague Letter, and dissuaded educational institutions

from challenging such action as promulgated by the United States Department of Education's Office for Civil Rights.

108.   Upon information and belief, the United States Department of Education is currently investigating over 200 colleges and universities for potential violations of Title IX in their handling of sexual misconduct complaints.

109.   Recognizing its widespread effect, Defendant Catherine Lhamon testified at the Senate Hearing that the 2011 Dear Colleague Letter has "sparked significant changes at colleges and universities as they worked to meet Title IX's requirements consistent with the 2011 [Dear Colleague Letter.]" Certainly, a true "guidance" document would not have brought about such significant changes at schools across the country.

110.   Further, the Dear Colleague Letter's use of authoritative language reveals the Defendants' intent that this be a binding document for all practical purposes, rather than serving merely as an interpretive rule, general statement of policy, and/or rule of agency procedure or practice.

111.   Specifically, the Dear Colleague Letter's use of the term "must" is precisely the kind of mandatory language that is "a powerful, even potentially dispositive, factor suggesting…substantive rules."[14]

---

[14] *Cmty. Nutrition Inst. v. Young*, 818 F.2d 943, 947 (D.C. Cir. 1987).

112.    On January 7, 2016, Senator James Lankford, Chairman of the Subcommittee on Regulatory Affairs and Federal Management submitted a letter to Defendant King, questioning whether the Department of Education is exceeding its legal authority by enforcing the 2011 Dear Colleague Letter as binding law. Senator Lankford pointed out that both the 2010 and 2011 Dear Colleague Letters "fail to point to precise governing statutory or regulatory language that supports their sweeping policy changes." He further noted that the letters "advance substantive and binding regulatory policies that are effectively regulations" and as such, should have been submitted to notice and comment procedures. As such, Senator Lankford requested a clarification as to specific statutory and/or regulatory language that the 2010 and 2011 Dear Colleagues purported to construe.

113.    Defendant Lhamon issued a response to Senator Lankford's letter more than one month later, on February 17, 2016. Noticeably, Defendant Lhamon eluded a direct response. Unable to cite to any governing statutory or regulatory authority, she justified the Defendants' position that the Dear Colleague is an "interpretative" rule not subject to notice and comment rulemaking on the grounds that Title IX's *original formulation* in 1972 went through notice-and-comment, and any further OCR interpretation, regardless of how novel, is not required. Seemingly, in Defendant Lhamon's view, the new sweeping regulations imposed

on educational institutions need not be submitted to the public for comment, as the original statute underwent such procedures, more than 40 years ago.

114.    Since 2011, the United States has consistently reaffirmed and adhered to the threat of substantial monetary penalties made in the Dear Colleague Letter.  For example, in July 2014, Defendant Lhamon stated that she would strip federal funding from any college found to be non-compliant with the requirements of the Dear Colleague Letter. "Do not think it's an empty threat," Lhamon warned.

115.    Janet Napolitano, president of the University of California and a former prosecutor, Governor of Arizona, and Secretary of the Department of Homeland Security, warned in an article in the *Yale Law & Policy Review* published online in August 2015 that "a cottage industry is being created" on campuses dedicated to handling tasks that fall outside the expertise of colleges and universities.

116.    While the 2011 Dear Colleague Letter claimed to merely interpret statements of existing law, the Defendants imposed substantial new requirements upon recipients of federal funding.

117.    Yet, while purporting to interpret statements of existing law, the Dear Colleague Letter failed to cite to any precise governing statute or regulatory

language which would support the implementation of such regulations without allowing for public notice and comment.

118.    Instead, the Dear Colleague Letter relies on its claim that legal precedent firmly establishes the proper standard of review applicable to school disciplinary proceedings.

119.    Indeed, Defendant Lhamon specifically expressed this view in her February 17, 2016 letter response to Senator Lankford, in which she stated "OCR's construction of the Title IX regulation is reasonable and, as explained in the 2011 DCL, *is based on case law*, mainly under Title VII of the Civil Rights Act of 1964, which courts have relied upon in analyzing Title IX." (emphasis added).

120.    It is well established that an agency's interpretation of law is not permitted any deference whatsoever, and as such, Defendants' reliance on prior case law to justify the imposition of new requirements under Title IX is patently improper.

121.    Defendant Lhamon acknowledged on June 26, 2014, that the 2011 Dear Colleague Letter "lays out the specific Title IX requirements applicable to sexual violence." Given the requirements identified in the letter are not contained within the implementing regulations, these new mandates are therefore new rules imposed as binding law.

122.    Prior to issuing the Dear Colleague Letter, the Defendants did not provide public notice, did not issue a proposed rule, did not provide the public an opportunity to offer comments, and did not consider public comments.

123.    Notwithstanding, the Defendants have continually enforced the Dear Colleague Letter and its newly created directives as mandatory, precisely the threat the APA was enacted to safeguard against.

124.    Such regulations include, but are not limited to the following:

- Grievance procedures *should* include voluntary informal mechanisms for resolution of some types of complaints;

- The school *should* notify a complainant of right to file criminal complaint;

- Schools *should* not wait for the conclusion of a criminal investigation or criminal proceeding to begin their own investigation, and must take interim measures if necessary to protect a student;

- Schools *must* use a preponderance of the evidence standard when evaluating allegations of sexual harassment or violence, to "to be consistent with Title IX standards."

- Schools *must* provide parties an equal opportunity to present relevant witnesses and other evidence;

- OCR *strongly* discourages schools from allowing the parties to personally question or cross-examine each other during the hearing;

- Grievance procedures *should* specify the time frame within which the school will conduct a full investigation, the parties will receive a response regarding the outcome and the parties may file an appeal;

- Both parties *should* be given periodic status updates;

- Both parties *must* be notified in writing about the outcome;

- Title IX *requires* a school to take steps to protect a complainant as necessary;

- Schools *must* have policies and procedures in place to protect against retaliatory harassment.

125.    As noted above, in determining whether a rule is considered substantive or interpretative, a Court will look to the language used within the document. The use of imperative terms such as "must" or "will" often demonstrates that a rule is substantive rather than interpretative. Here, the Dear Colleague Letter repeatedly uses the terms "should" and "must," conveying that the Letter is unequivocally a substantive and binding rule.

126.    For instance, the Dear Colleague Letter states "the school *must* use a preponderance of the evidence standard…" when evaluating allegations of sexual

harassment or violence, notwithstanding that the "clear and convincing evidence" standard has traditionally been used in college disciplinary hearings. The Dear Colleague Letter further indicates this standard must be used in order "to be consistent with Title IX standards," implying there is some statutory or regulatory authority for imposing such a standard, when in fact, no such authority exists.

127.    Given its inability to cite a specific authority, the Dear Colleague Letter instead offers two absurd rationalizations for its use of the preponderance of the evidence standard: (1) the Supreme Court's use of such a standard in civil litigation involving discrimination under Title VII of the Civil Rights Act of 1964; and (2) Defendant OCR's use of a preponderance of the evidence standard when resolving complaints against recipients. Neither of these explanations have merit.

128.    First, it is evident that school disciplinary proceedings concerning allegations of sexual misconduct may result in consequences as severe as those arising from criminal charges. Yet, school disciplinary proceedings are not courts of law and therefore are not equipped to ensure fundamental due process protections. As such, there is no basis for concluding the Supreme Court's use of the preponderance of the evidence standard in civil litigation cases translates to review of sexual misconduct complaints at a college or university.

129.   Second, the fact that the OCR has previously used the preponderance of the evidence standard, in its fund termination proceedings, does not imply that this is the appropriate standard for review of sexual misconduct complaints on college campuses. Certainly, an adjudication determining whether a student is responsible for committing an act of sexual misconduct deserves a standard of proof considerably higher than that reserved for civil disputes or a government agency's enforcement proceedings.

130.   Undoubtedly, the severity and permanency of damages that could result from a school's determination that a student committed sexual misconduct warrant a much higher burden of proof than the preponderance of the evidence.

131.   In fact, prior to implementation of the 2011 Dear Colleague Letter, it was generally accepted that the appropriate standard of proof in college disciplinary hearings was the higher standard of "clear and convincing evidence."

132.   As such, Defendants seem to erroneously base their implementation of an arbitrary standard of review on unrelated legal precedent and the agency's own administrative grievance procedures.

133.   As such, Defendant OCR has unilaterally declared that an exceedingly low burden of proof satisfies the requirement that procedures be

"equitable," even though such an expectation contradicts the burden of proof applied in criminal cases, where similar charges may be alleged.

134.    The mandate that schools utilize the preponderance of the evidence standard in determining whether a student is guilty of sexual misconduct has caused colleges and universities to make a rush to judgment, more often than not resulting in a finding of responsibility.

135.    While colleges and universities continue in their struggle to adopt policies and procedures that comply with the mandates of the Dear Colleague Letter, the failure of such schools to provide accused students with sufficient procedural protections has triggered a rapid increase in the number of lawsuits filed by students claiming they were wrongly disciplined under a system that failed to ensure their due process rights were properly protected. Typically, these cases are brought by male students erroneously found responsible for sexual misconduct after being subjected to an arbitrary, biased and Kafkaesque investigation and adjudication.

136.    Over the past year, district courts across the country have ruled in favor of student plaintiffs, finding that both private and public universities failed to afford the accused student with the requisite level of fair process, stemming from either Fourteenth Amendment due process or the student's private educational

contract, during a Title IX investigation. *See Doe v. The Board of Regents of the University System of Georgia, et al.,* N.D. Ga., Civil action 1:15-CV-4079-SCJ, Dkt. 40 (December 16, 2015)(Judge Jones)(denying Board of Regents' motion to dismiss related to expelled student's due process claims); *Doe v. Rector & Visitors of George Mason Univ.*, No. 1:15-CV-209, 2016 WL 775776 (E.D. Va. Feb. 25, 2016)(granting former student's motion for summary judgment in action against state university alleging his Fourteenth Amendment due process and free speech rights were infringed when he was expelled); *Doe v. Brandeis Univ.,* No. CV 15-11557-FDS, 2016 WL 1274533 (D. Mass. Mar. 31, 2016)(denying in part Brandeis University's motion to dismiss breach of contract claims filed by a student disciplined for sexual assault); *Doe v. Brown Univ.,* No. CV 15-144 S, 2016 WL 715794 (D.R.I. Feb. 22, 2016)(denying in part Brown University's motion to dismiss Title IX erroneous outcome and breach of contract claims filed by student suspended for sexual misconduct); *Doe v. Washington & Lee Univ.*, No. 6:14-CV-00052, 2015 WL 4647996 (W.D. Va. Aug. 5, 2015)(denying in part the University's motion to dismiss Plaintiff's Title IX erroneous outcome claim); *Doe v. Salisbury Univ.,* 107 F. Supp. 3d 481 (D. Md. 2015)(denying in part the University's motion to dismiss Plaintiff's Title IX retaliation claim).

137.    While the United States Department of Education's Office for Civil Rights drafted the Dear Colleague Letter in such a way that it would appear to be merely "interpretive" of Title IX, thus evading the APA's notice and comment rulemaking requirement, a plain reading of the Letter demonstrates to the contrary; that is, the Dear Colleague Letter creates new substantive and binding law.

138.    While Plaintiffs agree that all students should be able to enjoy a safe educational environment, regardless of sex, and that sexual harassment, discrimination and violence cannot be tolerated, the Defendants must abide by the proper statutory protocol in promoting these objectives.

139.    The Defendants' failure to abide by the requirements of the Administrative Procedure Act has therefore resulted in ongoing unlawful and *ultra vires* practices and policies which render the Dear Colleague Letter, and every disciplinary decision arising therefrom, unconstitutional, arbitrary and void.

140.    As noted by Senator Lankford in his March 4, 2016 letter response to Defendant Lhamon's February 17, 2016 correspondence, "Congressional oversight of agency action is a cornerstone to the checks and balances ensured by our Constitution." [15]

---

[15] *See* Senator James Lankford to John B. King, Jr. dated March 4, 2016 at p. 4.

141.    As such, given there is a strong presumption favoring judicial review of administrative action,[16] judicial review of the process by which Defendant OCR's 2011 Dear Colleague Letter was enacted and enforced is required here.

## CAUSES OF ACTION

### AS AND FOR A FIRST CAUSE OF ACTION
### Violation of the Administrative Procedure Act § 553

142.    Plaintiffs repeat and reallege each and every allegation hereinabove as if fully set forth herein.

143.    The Defendants issued the Dear Colleague Letter, under the guise of a "guidance" document to avoid the notice and comment requirements of the Administrative Procedure Act and subsequent judicial review, when in actuality, this purported "guidance" sets forth the Defendants' final conclusions with respect to Title IX compliance and creates specific legal obligations with clear and draconian consequences for violations.

144.    The Defendants exceeded their authority when they circumvented the Administrative Procedure Act's notice and comment rulemaking requirements and enforced the document as legally binding, under the threat of severe penalties.

---

[16] *See Mach Mining, LLC v. E.E.O.C.,* 135 S. Ct. 1645, 1651, 191 L. Ed. 2d 607 (2015).

145.    The Defendants' failure to abide by the APA's notice and comment requirements has therefore resulted in ongoing unlawful and *ultra vires* practices and policies which render the Dear Colleague Letter, and all disciplinary decisions arising therefrom, unconstitutional, arbitrary and void.

146.    Based on the foregoing, the Defendants, in enforcing the Dear Colleague Letter without following the notice and comment rulemaking requirements of the Administrative Procedure Act, have imposed on colleges and universities, including Georgia Tech, an unworkable regulatory framework that has resulted in severe, unwarranted and permanent damages to students erroneously accused of misconduct, under the threat of severe penalties including rescission of federal funds.

147.    The United States Department of Education, by issuing the Dear Colleague Letter without following the Administrative Procedures Act's rulemaking requirements has further resulted in the imposition of unnecessary costs and expenses that flow directly to both Federal and Georgia Taxpayers, including Plaintiffs.

148.    As a direct and proximate result of the above conduct, Plaintiffs have sustained damages, including, without limitation, economic injuries and other direct and consequential damages.

149.    By reason of the foregoing, Plaintiffs request, pursuant to 28 U.S.C. § 2201, a declaration that: (i) Defendants violated the Administrative Procedure Act when they issued the Dear Colleague Letter without submitting the document to notice and comment rulemaking; (ii) such failure has resulted in ongoing unlawful and *ultra vires* practices and policies; (iii) such failure has resulted in substantial damages to federal and state taxpayers; and (iv) the Dear Colleague Letter of 2011 is unconstitutional, arbitrary and void.

## AS AND FOR A SECOND CAUSE OF ACTION
### Injunctive Relief

150.    Plaintiffs repeat and reallege each and every allegation hereinabove as if fully set forth herein.

151.    In light of the Dear Colleague Letter, each of the twenty-nine schools in the University System of Georgia were forced to create a Title IX enforcement office and designate and hire personnel to ensure compliance with the Letter's requirements and avoid the risk that the University System's funding could be revoked. The University System of Georgia has spent millions of dollars on this endeavor since the issuance of the Dear Colleague Letter in an effort to avoid the loss of Federal funds. The loss of Federal funds would require Georgia taxpayers to fund the resulting budget gap, but would inevitably necessitate cutting back programs at the schools.

152.    Plaintiffs have been adversely affected and aggrieved by the foregoing actions of Defendants, in their status as both Federal and Georgia taxpayers and the parents of a student currently enrolled at Georgia Tech.

153.    By reason of the foregoing, Plaintiffs request, pursuant to 28 U.S.C. § 2201, a declaration that: (i) Defendants violated the Administrative Procedure Act when they issued the Dear Colleague Letter without submitting the document to notice and comment rulemaking; (ii) such failure has resulted in ongoing unlawful and *ultra vires* practices and policies; (iii) such failure has resulted in substantial damages to federal and state taxpayers; and (iv) the Dear Colleague Letter of 2011 is unconstitutional, arbitrary and void.

## AS AND FOR A THIRD CAUSE OF ACTION
### Declaratory Relief

154.    Plaintiffs repeat and reallege each and every allegation hereinabove as if fully set forth herein.

155.    Because this Court has jurisdiction as a threshold matter, the Declaratory Judgment Act, 28 U.S.C. §§ 2201-2202, provides this Court the power to "declare the rights and other legal relations of any interested party..., whether or not further relief is or could be sought." 28 U.S.C. § 2201; *accord* Fed. R. Civ. P. 57 advisory committee note ("the fact that another remedy would be equally effective affords no ground for declining declaratory relief").

156.    By reason of the foregoing, Plaintiffs request, pursuant to 28 U.S.C. § 2201, a declaration that: (i) Defendants violated the Administrative Procedure Act when they issued the Dear Colleague Letter without submitting the document to notice and comment rulemaking; (ii) such failure has resulted in ongoing unlawful and *ultra vires* practices and policies; (iii) such failure has resulted in substantial damages to federal and state taxpayers; and (iv) the Dear Colleague Letter of 2011 is unconstitutional, arbitrary and void.

## PRAYER FOR RELIEF

**WHEREFORE,** for the foregoing reasons, Plaintiffs demand judgment against Defendants as follows:

(i)    On the First Cause of Action for Violation of the Administrative Procedure Act, pursuant to 28 U.S.C. § 2201, a judicial declaration that: (i) Defendants failed to abide by the requirements of the Administrative Procedure Act; (ii) such failure has resulted in ongoing unlawful and *ultra vires* practices and policies; (iii) such failure has resulted in substantial damages to federal and state taxpayers; and (iv) the Dear Colleague Letter of 2011 is unconstitutional, arbitrary and void;

(ii)     On the Second Cause of Action for Injunctive Relief, pursuant to 28 U.S.C. § 2201, a judicial declaration that: (i) Defendants failed to abide by the requirements of the Administrative Procedure Act; (ii) such failure has resulted in ongoing unlawful and *ultra vires* practices and policies; (iii) such failure has resulted in substantial damages to federal and state taxpayers; and (iv) the Dear Colleague Letter of 2011 is unconstitutional, arbitrary and void;

(iii)    On the Third Cause of Action for Declaratory Judgment, pursuant to 28 U.S.C. § 2201, a judicial declaration that: (i) Defendants failed to abide by the requirements of the Administrative Procedure Act; (ii) such failure has resulted in ongoing unlawful and *ultra vires* practices and policies; (iii) such failure has resulted in substantial damages to federal and state taxpayers; and (iv) the Dear Colleague Letter of 2011 is unconstitutional, arbitrary and void; and

(iv)    awarding Plaintiffs such other and further relief as the Court deems just, equitable and proper.

## **JURY DEMAND**

Plaintiffs herein demand a trial by jury of all issues so triable in the present matter.

Dated: Atlanta, Georgia
        April 21, 2016

/s/ *Jonathan E. Hawkins*
Jonathan E. Hawkins, Esq.
Georgia Bar No. 338779
Christopher E. Adams
Georgia Bar No. 789600
hawkins@khlawfirm.com
adams@khlawfirm.com

KREVOLIN & HORST, LLC
1201 W. Peachtree Street, N.W.
Suite 3250, One Atlantic Center
Atlanta, GA 30309
(404) 888-9700
(404) 888-9577 (facsimile)

-and-

/s/ *Andrew T. Miltenberg*
Andrew T. Miltenberg, Esq.
(motion for admission *pro hac vice*
 to be filed)
Tara J. Davis, Esq.
(motion for admission *pro hac vice*
to be filed)
Jeffrey S. Berkowitz, Esq.
(motion for admission *pro hac vice*
to be filed)
NESENOFF & MILTENBERG,
LLP
363 Seventh Avenue, Fifth Floor
New York, New York 10001
(212) 736-4500
amiltenberg@nmllplaw.com
tdavis@nmllplaw.com
jberkowitz@nmllplaw.com

*Attorneys for Plaintiffs*